Filed 9/11/15  Laura M. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| LAURA M., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF TULARE COUNTY, <br><br> Respondent; <br><br> TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Real Party in Interest. | F071793 <br><br> (Super. Ct. Nos. JJV066795A, JJV066795B) <br><br><br> **OPINION** |

### THE COURT[*]

ORIGINAL PROCEEDING; petition for writ of mandate.  Michael B. Sheltzer, Judge.

Laura M., in pro. per. for Petitioner.

No appearance for Respondent.

Kathleen Bales-Lange, County Counsel, and Abel C. Martinez, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]     Before Gomes, Acting P.J., Kane, J. and Smith, J.

Laura M. is the great-great maternal aunt and former prospective adoptive mother of four-year-old Jordan and two-year-old Fabian, the subjects of this writ petition. In April 2015, the Tulare County Health and Human Services Agency removed the children from Laura's custody. Laura objected to the children's removal and requested the superior court's review. The superior court, acting as the juvenile court, found it would be in the children's best interest to remove them from Laura's custody and so ordered.

Laura in propria persona seeks writ review (Welf. & Inst. Code, § 366.28)[1] of the juvenile court's decision. We deny the petition.

### PROCEDURAL AND FACTUAL SUMMARY

In February 2013, the Tulare County Health and Human Services Agency (agency) removed then 18-month-old Jordan and newborn Fabian from their mother D.M. (hereafter "the mother") after she and Fabian tested positive for methamphetamine and opiates. In addition, the home in which the mother lived with Jordan was dirty and hazardous. There was exposed plumbing and electrical wiring on the floor accessible to Jordan and there was a drug pipe in Jordan's backpack. The agency placed the children in foster care.

The juvenile court appointed a court-appointed special advocate (CASA) for the children, exercised its dependency jurisdiction over them, and provided the mother 12 months of reunification services. However, the mother did not comply. Consequently, in March 2014, the juvenile court terminated her reunification services and set a section 366.26 hearing. Meanwhile, in June 2013, the agency placed the children with Laura and her husband.

In its report for the section 366.26 hearing, the agency informed the juvenile court that Laura and her husband were committed to adopting Jordan and Fabian. The children looked to them to meet their needs and called them "mom" and "dad." The agency

---

[1] All further statutory references are to the Welfare and Institutions Code.

recommended the juvenile court terminate the mother's parental rights and free the children for adoption.

The CASA concurred with the agency's recommendation, but was concerned that Laura's home was unkempt and at times unsanitary and the children were generally unbathed and dressed in dirty clothes. The CASA noticed the children in soiled diapers for extended periods of time and had to ask someone to change them. The CASA expressed her concern to the social worker who stressed to Laura several times the importance of maintaining a clean environment for the children.

In July 2014, at an uncontested section 366.26 hearing, the juvenile court terminated the mother's parental rights.

In December 2014, at a post-permanency plan review hearing (§ 366.3), the juvenile court found that adoption remained the best permanent plan for the children and set the next review hearing for June 17, 2015. The agency projected that the adoption would be finalized by June 30, 2015.

In early April 2015, Laura informed adoption social worker Cecilia Gomez that she allowed her "friend" Lisa and Lisa's three children to live in her home because Lisa was homeless.[2] Gomez told Laura that Lisa would have to be fingerprinted to remain in the home. Laura agreed to have Lisa comply.

On April 29, 2015, police requested the agency's assistance at Laura's home. An anonymous caller reported hearing a young female child screaming and crying and an adult male yelling, "I'm going to beat your ass." When the police arrived, an adult male was driving away in a van. The police chased the van and arrested the 27-year-old male driver who turned out to be Laura's son, John. John was arrested for failure to appear stemming from a drug charge. The police verified that John lived in Laura's home.

---

[2]     Laura later disclosed that Lisa is her niece.

3.

Emergency response social worker Melissa Urena obtained Laura's permission to enter the home. The front door was covered with flies and there were cigarette butts scattered throughout the home. Upon entering the home, Urena detected a strong smell of urine and cigarettes. The kitchen was dirty and the white tile floor appeared to have not been cleaned in weeks. Urena counted 14 people including children in the home. Laura explained that not all of the adults lived with her; some were moving out and some were visiting. She said John was there to help with the move. She also said that Gomez had given her until May 1, 2015, to move everyone out of the house. Urena subsequently learned that John had a history of sexually abusing other children when he was a minor.

Gomez was called to the home and informed Laura she was removing the children because there were numerous people living in the home and because Laura gave inconsistent explanations for their presence there. Gomez gave Laura a "Notice of Emergency Removal" Judicial Council form JV-324 and left with the children. Several days later, the foster parent who took the children in called to say that the children were infested with lice.

On May 4, 2015, Laura filed an "Objection to Removal" Judicial Council form JV-325 and a "Request for Prospective Adoptive Parent Designation" Judicial Council form JV-321.

On May 15, 2015, the juvenile court convened a hearing on Laura's requests for prospective adoptive parent designation and her objection to the removal. Laura testified that Lisa and her children were living with her because she (Laura) takes care of her family. On the day the police were summoned to her home, Lisa was moving out because she refused to be fingerprinted. Everyone else was there to help Lisa move and the house was in disarray because they were in the process of moving her. The screaming child belonged to another relative. Laura said the child "scream[ed] like a banshee if she [did not] get her way." She denied that her son John lived with her and said the children were dirty because they were playing outside.

4.

At the conclusion of the hearing, the juvenile court granted Laura prospective adoptive parent status and found that removal was appropriate under the circumstances. The court expressed its concern that removing the children from Laura would disrupt a long-term relationship and may not be in their best interest. Consequently, the court continued the hearing to June 10, 2015, to consider the issue of removal and asked the agency to provide an update on the circumstances. The court ordered the agency to provide Laura weekly one-hour supervised visits in the interim.

Prior to the hearing, the agency reported that a social worker made an unannounced visit to Laura's home and found it to be in a worse condition than it was when the children were removed. It also appeared that there were other people living there although Laura denied it. In addition, the children appeared to be distancing themselves from Laura during their visits. At the same time, the children were bonded to their foster parents who wanted to adopt them. The children called them "mom" and "dad" and Jordan said he loved his home and wanted to stay there. The children were enrolled in school and looking forward to activities with their new friends and family.

On June 10, 2015, the juvenile court reconvened the hearing on the agency's request to remove the children. Laura provided the court photographs she took of her home after the unannounced visit. The court admitted the photographs into evidence. Laura told the court, "I've done what I'm supposed to do. I got my house back in order. It's better than before.… There is no one living with me."

The court also allowed Laura to discuss her visits with the children since the last hearing. She said that during the first visit she tried to talk with the boys and hug and kiss them but the social worker kept telling them to go play. On the second visit, Jordan was calling Fabian "James." On the third and last visit, Jordan said, "I'm supposed to call you Laura, mama says." Laura asked the social worker why she was allowing it. The social worker said that was what they were told to do.

At the conclusion of the hearing, the juvenile court remained concerned about the fact that the children had a long-standing relationship with Laura and were bonded to her. The court also suspected that the children may have been manipulated as to how they would refer to their foster parents. The court took the matter under submission to review the evidence and continued the hearing.

On June 12, 2015, the juvenile court ruled that it was not in Jordan and Fabian's best interest to return them to Laura and ordered that the removal orders remain in effect. However, the court did not arrive at its decision easily and stated, "This is a close case in the [c]ourt's view."

In determining the children's best interest, the court weighed the fact that the agency knew all along that the condition of Laura's home was a concern and still felt it was in the children's best interest to be there against the fact that the children were in a home where the condition of the home was not a concern. The court explained that if it returned the children to Laura, it would have to monitor a situation that should be permanent. The post-permanency review hearing remained set for June 17, 2015.

This petition ensued.

## DISCUSSION

Laura contends in essence the agency failed to establish that it was in the children's best interests to be removed from her home. More specifically, she argues she did everything that was asked of her. She questions why the agency allowed her to have custody of the children if it was not in their best interest. Finally, she argues the agency presented new evidence at the hearing that was unfounded; i.e., that the children were in soiled diapers on many occasions.

The juvenile court has the authority to remove a child from the home of a prospective adoptive parent if the court determines that removal is in the child's best interests. (§ 366.26, subd. (n)(3)(B).)

6.

We review a juvenile court's decision to terminate placement for abuse of discretion. (*In re N.M.* (2011) 197 Cal.App.4th 159, 171.) Applying this standard, we concur with the juvenile court that the children's interests were best served by removing them from Laura's custody.

Dependency proceedings were initiated in this case in part because Jordan and Fabian were living in deplorable conditions with their mother. Within four months of their initial removal, they were placed with Laura where, according to the CASA worker, they did not fare much better. The CASA described Laura's home as unkempt and unsanitary and stated that the children were not generally bathed and wore soiled diapers for extended periods of time. Instead of gaining safety and stability in a new adoptive home, the children were essentially in the same position they were in before the juvenile court intervened.

As to Laura's contention that the agency introduced new evidence related to the children's diapers, she does not cite this court to the portion of the record where that occurred. Further, it appears to us that the issue of the children's diapers was not new but rather an ongoing concern.

As to Laura's other contentions, the juvenile court acknowledged that she cleaned her home as depicted in the photographs. However, the court considered it a temporary fix. There was no guarantee that Laura could maintain a clean home given the persistence of the problem. Further, the fact that the agency placed the children with her knowing that her home was marginal does not mean that the juvenile court must return them there when the court finds it is not in their best interest to do so.

In our view, the record makes clear that the juvenile court heavily weighed the facts that Jordan and Fabian had a long relationship with Laura and were bonded to her. The court considered at length whether it was in their best interest to be returned to her in order to preserve that bond. However, the court also recognized that the children would be at risk of being removed in the future because of Laura's apparent inability to properly

7.

care for them.  Ultimately, their interests were best served by living in a stable, protective and clean environment.

We find no abuse of discretion in the juvenile court's determination that it was in Jordan and Fabian's best interests to remove them from Laura's home.

## DISPOSITION

The petition for writ of mandate is denied.